UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Confectionery Arts International, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 3:17-cv-00108 (KAD) |
| Sunflower Sugar Art USA, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | November 16, 2018 |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>APPLICATION FOR PREJUDGMENT REMEDY</u>**

Pursuant to Federal Rule of Civil Procedure 64, District of Connecticut Local Rule 4(c), and Conn. Gen. Stat. § 52-278a, et. seq., and in support of the claims asserted in its Amended Complaint, Confectionery Arts International, LLC ("CAI" or "Plaintiff"), by and through the undersigned counsel, seeks a prejudgment remedy of attachment against Sunflower Sugar Art USA, Inc. ("Sunflower" or "Defendant"). A prejudgment remedy of attachment is warranted in this case to maintain the status quo between the parties with respect to the financial capacity to satisfy judgment and to prevent the dissipation or transfer of assets by the Defendant should, as is likely, the Court render judgment in Plaintiff's favor.

## I.   <u>PROCEDURAL HISTORY</u>

On January 25, 2017, CAI initiated this action by way of a complaint against Sunflower and John Does 1 through 10 ("the initial complaint"). The initial complaint alleged claims for trademark infringement and dilution under the Lanham Act, violations of Connecticut common law of unfair competition, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), tortious interference with business relations and trade libel. CAI's claims were connected to

Sunflower's infringement of CAI's federally registered DISCO DUST® trademark and Sunflower's tortious conduct toward CAI with respect to that trademark.

CAI filed Sunflower's executed Waiver of Service under Fed. R. Civ. P. 4(d) on April 28, 2017, which service was sent on March 24, 2017, allowing Sunflower until May 23, 2017 to serve its Answer.  Sunflower served its Answer on July 19, 2017, after CAI gave notice on July 7, 2017 of its intent to request an Entry of Default for failure to plead or otherwise defend under Fed. R. Civ. P. 55(a).  CAI agreed not to oppose Sunflower's filing for the purpose of efficiency and moving the case forward.  In exchange, on July 26, 2017, CAI requested Sunflower's consent to file an amended Complaint, which Defendant's counsel originally granted by email on July 26, 2017.  On August 9, 2017, CAI timely filed its Answer to Sunflower's counterclaims of declaratory judgment of non-infringement, Florida common law trademark infringement, Florida common law unfair competition and false designation of origin and unfair competition.

After serendipitously discovering facts not known to it before, CAI moved to amend its complaint on November 22, 2017. Sunflower did not consent to CAI's motion to amend, but did not in the end oppose it.  CAI's Amended Complaint, filed on March 5, 2018, is Plaintiff's currently operative pleading.  Sunflower responded to the Amended Complaint on November 13, 2018.

The parties submitted their Rule 26(f) report on March 13, 2018. The initial discovery plan conceived that discovery would be conducted in phases, that fact discovery would be commenced March 27, 2018 and completed by June 15, 2018, and that all discovery, including expert discovery would be completed by November 15, 2018.  CAI timely served its initial disclosures on March 27, 2018.

In May 2018, CAI and Sunflower discussed extending the fact discovery deadline to

allow Sunflower to serve to its initial disclosures, respond to CAI's discovery requests, file a stipulated protective order with the court, and serve whatever discovery requests it intended to serve.  On June 12, 2018, CAI contacted Sunflower about the status of the draft protective order and was informed in response that Sunflower's lead counsel, who had not yet made an appearance, would be ending his legal practice, that local counsel would withdraw, and that Sunflower would shortly be retaining new counsel.

On June 15, 2018, CAI filed a motion for conference with the Court (later mooted) for guidance on discovery with Sunflower not represented by counsel. On June 27, 2018, new counsel for Sunflower filed their appearances in this case and on July 3, 2018, previous counsel's motion to withdraw was granted.

The Court approved the Parties' stipulated Protective Order on October 5, 2018, and per the Court's grant of the Parties' recent Joint Motion to Modify its Scheduling Order, fact discovery closes November 30, 2018, the deadline for dispositive motions is December 12, 2018, and the case will be trial ready on March 14, 2019.

## II.     FACTUAL BACKGROUND

This action arises from sales of goods by Sunflower under a mark infringing a federally registered trademark, DISCO DUST, used and owned continuously since at least 1999. Since the filing of CAI's original complaint, CAI has added claims of trademark infringement, unfair competition and unfair trade practices with respect to CAI's federally registered "house mark," CONFECTIONERY ARTS INTERNATIONAL (stylized).

CAI has been engaged in the development, production, sale, offer for sale, distribution and marketing of decorative glitter for the confectionery industry and individual bakers and makers of confectionery goods under the brand name DISCO DUST since at least 1997, with a

date of first use in commerce at least as early as May 1999. (Czerczak Aff. ¶ 7; Am. Compl. ¶ 22.)  On October 1, 2010, after over a decade selling its DISCO DUST-branded products, CAI filed an application to register the mark DISCO DUST on the Principal Register of the United States Patent and Trademark Office ("USPTO") for "decorative glitter" in International Class 20 ("Class 20") and various goods in International Class 30 ("Class 30"). (Czerczak Aff. ¶ 11.)  CAI has since ceased using the mark and abandoned the registration for goods in Class 30. (*Id.* ¶ 12.)

In or around December of 2016, CAI discovered that Sunflower was selling or offering for sale its own decorative glitter under the "Disco Dust" mark.  (Czerczak Aff. ¶ 22.) This use by Sunflower of the term "Disco Dust" was not authorized by CAI.  (*Id.* ¶¶ 22, 24.) On December 12, 2016, CAI informed Sunflower that it was infringing its registered mark.  (*Id.* ¶ 23.)  On January 23, 2017, Sunflower *pro se* filed a Petition to Cancel (Cancellation No. 92065334) CAI's DISCO DUST trademark registration before the Trademark Trial and Appeal Board ("TTAB").  Sunflower continues to sell decorative glitter under the mark "Disco Dust." (Czerczak Aff. ¶ 23.)

CAI and Sunflower are direct competitors in the same market, i.e. the production, distribution and sale of confectionery products. (*Id.* ¶ 25.)  Both CAI's DISCO DUST®-branded products and the decorative glitter offered for sale under Sunflower's "Disco Dust" product name are sold in the same channels of trade.  (*Id.* ¶ 26.)  As a result, there have likely been instances of overlapping purchasers between CAI and Sunflower. (*Id.* ¶ 27.)

After CAI informed Sunflower of its infringement, but before CAI filed its original complaint in this action, Sunflower contacted at least one customer of CAI's in attempt to divert the customer's business from CAI to Sunflower. In its communication to CAI's customer, Sunflower represented that CAI's DISCO DUST®-branded products are imitation products

4

made with ingredients coming from China. (*Id.* ¶¶ 40-41; Am. Compl. at ¶ 88.)  The representation made by Sunflower to CAI's customer that CAI's products are "imitation" DISCO DUST®-brand products is false. The representation that CAI's DISCO DUST® products are made in China is likewise false. (Czerczak Aff. ¶ 41.)

In addition, Sunflower, using fake usernames, has on multiple occasions posted false reviews of CAI's DISCO DUST® products on internet retail websites.  In at least one of these reviews, Sunflower made a false accusation that there were "FDA advisory issues on the plastic glitter."  (Czerczak Aff. ¶ 39.)

CAI has also registered—and has used in commerce since 1997—its company name as a trademark with the USPTO. The CONFECTIONERY ARTS INTERNATIONAL® "house mark" bears USPTO Registration No. 4,263,560. CAI's house mark is displayed on most, if not all, of CAI's product packaging and goods.

In its Petition to Cancel CAI's DISCO DUST ® trademark registration, among other claims, Sunflower alleged that CAI did not actually own the mark DISCO DUST because of a typographical error made by CAI in its application for registration, listing "Confection*ary* Arts International, LLC" (spelled with an "a" rather than an "e") as the owner of the mark. (Sunflower later withdrew its claim on this basis in an amended pleading before the TTAB.)[1] On January 25, 2017, two days after the filing by Sunflower of its Petition to Cancel, Sunflower incorporated a corporation under the name "Confection*a*ry Arts International, LLC." (spelled with an "a"). (Czerczak Aff. ¶¶ 33-35.)  The registered address of the corporation "Confectionary Arts International, LLC" is identical to the registered address of Sunflower. (*Id.* ¶ 33; Am. Compl. ¶ 105.)  The incorporation of this business entity was done by Michael Nugent, who is named as

---

[1] This error has been corrected by an amendment under Section 7 of the Lanham Act, 15 U.S.C. § 1057(e), 1057(h) (allowing for amendments to a Certificate of Registration to be issued to correct non-material errors in the Certificate of Registration).

"Member." Mr. Nugent is a relative and business associate of Sunflower's principal.  (Czerczak Aff. ¶¶ 33-44; Am. Compl. ¶ 107.)

CAI did not become aware of the existence of Sunflower's "Confectionary Arts International, LLC" corporate filing until it received notice from the Connecticut Department of Energy and Environmental Protection ("DEEP") that it was in violation of a minor recycling regulation. (Czerczak Aff. ¶ 35.)  The DEEP letter was addressed to Sunflower's corporate address and through an investigation under the Freedom of Information Act, it was revealed that a DEEP representative was sent to CAI because of an anonymous and false tip sent to the United States Environmental Protection Agency ("EPA") that CAI had been burning plastic materials. (*Id.* ¶ 36.)

In addition to making email and voicemail threats to destroy CAI's reputation, Sunflower has also via email threatened to report CAI to the Food and Drug Administration and then to make the decorating world aware of the report.  (*Id.* ¶ 37-38.)

### III.    LEGAL STANDARD

In general, a prejudgment remedy is intended to secure the satisfaction of a judgment should the plaintiff prevail and to prevent the dissipation of assets by the defendant by bringing those assets into the Court's custody. *Roberts v. Triplanet Partners, LLC,* 950 F. Supp. 2d 418, 420 (D. Conn. 2013) (citing *Cendant Corp. v. Shelton*, No. 3:06-cv-854 (JCH), 2007 WL 1245310, at *2 (D. Conn. Apr. 30, 2007)); *First Equity Group, Inc. v. Culver*, No. 3:08-cv-01893 (VLB), 2009 WL 353490 at *6 (D. Conn. Feb. 11, 2009). Federal Rule of Civil Procedure 64 provides that prejudgment remedies available under state law are likewise available in federal court. Fed. R. Civ. P. 64(a); *New England Health Care Employees Welfare Fund v. iCare Mgmt., LLC.*, 792 F. Supp. 2d 269, 274 (D. Conn. 2011).

Under Connecticut law, prejudgment remedies are defined as "any remedy or combination of remedies that enables a person by way of attachment, foreign attachment, garnishment or replevin to deprive the defendant in a civil action of, or affect the use, possession, or enjoyment by such defendant of, his property prior to final judgment." Conn. Gen. Stat. 52-278a(d); *TES Franchising, LLC v. Feldman*, 286 Conn. 132, 136, 943 A.2d 406, 411 (2008). A Court shall award a prejudgment remedy to the plaintiff if the Court finds that "the plaintiff has shown probable cause that…a judgment will be rendered in the matter in the plaintiff's favor in the amount of the prejudgment remedy sought and finds that a prejudgment remedy securing the judgment should be granted" taking into account defendant's defenses, claims, set-offs, claims of exemption or adequate insurance. Conn. Gen. Stat. 52-278d(a); *Margolin v. Kleban & Samor, P.C.*, 275 Conn. 765, 767-768 n.3, 882 A.2d 653, 657 (2005).

"Probable cause" has been defined under Connecticut law as "a *bona fide* belief in the existence of facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." *Three S. Development Co. v. Santore*, 193 Conn. 174, 175, 474 A.2d 795, 796-797 (citing *Wall v. Toomey*, 52 Conn. 35, 26 (1884)); *Valencis v. Nyberg*, 160 Conn. App. 777, 782, 125 A.3d 1026, 1032 (2015). "Probable cause is less demanding than the 'preponderance of the evidence' or 'likelihood of success' standards." *SS & C Technologies, Inc. v. Providence Inv. Mgmt.*, 582 F.Supp.2d 255, 257 (D. Conn. 2008); *see also, Ledgebrook Condominium Ass'n, Inc. v. Lusk Corp.*, 172 Conn. 577, 584, 376 A.2d 60 (1977) ("Proof of probable cause as a condition of obtaining a prejudgment remedy is not as demanding as proof by a fair preponderance of the evidence.").

Probable cause is a "flexible, common sense standard" that does not require that the

plaintiff's belief that probable cause exists be correct or more likely true than false. *New England Land. Co., Ltd. v. DeMarkey*, 213 Conn. 612, 620, 569 A.2d 1098 (1990). In short, the plaintiff is not required to prove its case, but rather to show that probable cause exists to sustain the validity of the claim. *Walpole Woodworkers. Inc. v. Atlas Fencing, Inc.*, 218 F.Supp.2d 247, 249 (D. Conn. 2002) (citing *New England Land Co., Ltd.*). As such, the hearing to determine probable cause is not a "full scale trial on the merits," but rather a hearing to weigh the probabilities as to both the factual and legal issues of the case. *Bank of Boston Connecticut v. Schlesinger,* 220 Conn. 152, 156 (1991); *Babiarz v. Hartford Special, Inc.*, 2 Conn. App. 388, 393, 480 A.2d 561 (1994).

## IV.   ARGUMENT

### A.  PROBABLE CAUSE EXISTS TO SUSTAIN THE VALIDITY OF PLAINTIFF'S TRADEMARK INFRINGEMENT CLAIM FOR THE DISCO DUST® MARK.

Suits for trademark infringement are governed by Section 32 of the Trademark Act of 1946 ("the Lanham Act") which holds "any person" liable for infringement that uses in commerce any "reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). Section 32 also holds liable any person who applies a reproduction, copy, counterfeit or colorable imitation to "labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used in commerce" in such a way as to cause a likelihood of confusion, mistake or deception. 15 U.S.C. § 1114(1)(b).

A claim for trademark infringement is analyzed under a two-prong test. *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d. Cir. 1993). The first prong of the test examines whether the owner of the trademark is entitled to trademark protection. The second

prong focuses on whether the junior user's use of the mark is likely to cause confusion as to the origin or sponsorship of the junior user's goods or services. *Guthrie Healthcare System v. ContextMedia, Inc.* 826 F.3d 27, 37 (2d. Cir. 2016).

      (i)     Plaintiff's DISCO DUST® mark has a presumption of validity and is entitled to <u>protection, because it has been registered on the Principal Register of the USPTO.</u>

A Certificate of Registration from the USPTO is *prima facie* evidence that the mark is both registered and valid (i.e. protectable), that the registrant is the owner of the mark, and that the registrant has the exclusive right to use the mark in commerce. 15 U.S.C. § 1057(b); *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt,, Inc.*, 192 F.3d 337, 345 (2d. Cir. 1999). CAI obtained federal registration for the DISCO DUST® mark on January 24, 2012. Therefore, as CAI's DISCO DUST® mark is presumed valid and protectable through its Certificate of Registration, the first prong of the trademark infringement test is satisfied.

      (ii)     There is probable cause to believe that consumers would likely be confused as to <u>origin or sponsorship of Sunflower's products in the marketplace.</u>

In determining whether there is a likelihood of confusion as to the origin or sponsorship of a junior user's goods via its presence in the marketplace, an eight-factor balancing test is employed, called the "*Polaroid* test" in this Circuit. *Polaroid Corp. v. Polarad Electronics, Corp.*, 287 F.2d 492, 495 (2d Cir. 1961) (Friendly, J.). The eight factors in the *Polaroid* test are: (1) the strength of the trademark; (2) the similarity of the marks; (3) the proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the junior user's market; (5) evidence of actual confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) the respective quality of the products; and (8) the sophistication of consumers in the relevant market. *Star Industries v. Bacardi & Co., Ltd.*, 412 F.3d 373, 384 (2d. Cir. 2005).

CAI's DISCO DUST® is a "strong mark" because it possesses both inherent

distinctiveness and secondary meaning in the marketplace. The "mark strength," or first factor of the *Polaroid* test, turns on the ability of the mark to "uniquely identify the source" of the mark owner's products. *Id.* "There are two components of a mark's strength: its inherent distinctiveness and the distinctiveness it has acquired in the marketplace." *Brennan's Inc. v. Brennan's Restaurant, LLC*, 360 F.3d 125, 130-131 (2d. Cir. 2004). Inherent distinctiveness concerns the inherent ability to identify a mark owner's goods or services "without regard to whether it has actually done so" through substantial and exclusive sales of goods under that mark. Acquired distinctiveness looks at the extent of customer recognition of the mark as a designation of origin of the mark owner's goods. *Id.* at 131. A mark can be considered a strong mark through either inherent or acquired distinctiveness. *Two Pesos, Inc. v. Taco Cabana, Inc.* 505 U.S. 763, 769 (1992) (noting that a mark can be protected by either inherent or acquired distinctiveness).

On the sliding scale of inherent distinctiveness, the DISCO DUST® mark is, at the very least, a suggestive mark. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9-11 (2d. Cir. 1976) (describing the four main categories of distinctiveness); *see also, TCPIP Holding Co. v. Haar Communications*, 244 F.3d 88, 93-94 (2d. Cir. 2001) (summarizing the difference between descriptive and suggestive marks). The term "Disco" refers to a musical genre that emerged in the early 1970's, originating from the term discothèque, French for "library of phonograph records."  "Disco" in arbitrary combination with the term "dust" does not naturally connect to the music genre at the core of the meaning of the term "disco," or even to the nightclub subculture with its mirrored balls where disco music was played.  As would be the case if the term defining another musical genre were combined with a completely non-musical term, e.g. jazz dust, rock 'n' roll dust, or baroque dust, "imagination, thought, and perception" are

required for the consumer to conclude that DISCO DUST® is decorative glitter. *See Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d. Cir. 2016) (finding the mark "COLLECTIVE" to be suggestive as a matter of law for data-driven analytic software).  Since the "mental leap" between the words "Disco Dust" and decorative glitter is not instantaneous, CAI's DISCO DUST® is suggestive, and therefore inherently distinctive as a matter of law. *Id.* at 163.

In addition to the mark's being at least suggestive, CAI has been using the DISCO DUST® mark since at least May 1999. (Czerczak Aff. ¶ 7.) The USPTO found that, through substantial sales and over ten-year use of the DISCO DUST® mark, the mark had developed secondary meaning as an identifier as the source of the goods. *Inwood Labs, Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851, n. 11 (1982) (explaining that secondary meaning is when "the primary significance of [the mark] is to identify the source of the product rather than the product itself").

In sum, CAI's DISCO DUST® mark is a strong mark because of its inherent distinctiveness (in that it is at least a suggestive mark) and its extensive and longstanding use in the sale and offer for sale of decorative glitter by CAI. As such, the first factor in the *Polaroid* test weighs in favor of a finding of likelihood of confusion.

The second *Polaroid* factor, the similarity of marks, weighs strongly in favor of a finding of likelihood of confusion because the marks at issue are not just similar, they are *identical*. Sunflower does not dispute that it has been using the term "Disco Dust" as a mark in connection with the sale, offer for sale, and advertising of its decorative glitter and associated goods. Since the marks at issue are identical, this strongly favors a finding of likelihood of confusion. *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 142 (3rd Cir. 1981) (holding that there is a "great likelihood of confusion when an infringer uses the exact trademark").

11

The third *Polaroid* factor, the competitive proximity of the products in the marketplace, also weighs strongly in favor of a finding of likelihood of confusion because CAI and Sunflower are direct competitors in the relevant marketplace and the goods are both decorative glitter products. (Czerczak Aff. ¶¶ 25-27.) Furthermore, Sunflower's goods run in the same overall channels of trade as CAI's DISCO DUST® products, and the marketing of Sunflower's "Disco Dust" products is aimed at the same types of purchasers as CAI's customers. (*Id.*)

Given the extreme similarity between Sunflower's goods to those sold by CAI, this factor weighs strongly in favor of a finding of likelihood of confusion, since under such circumstances it is more likely that a consumer will assume that Sunflower's products and CAI's products emanate from a common source. *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 150 (2d. Cir. 2005) (noting that "the closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source").

The "bridging the gap" factor, the fourth *Polaroid* factor is not relevant here because there is simply no gap to bridge, since Sunflower's products are in direct competition with CAI's DISCO DUST® products. *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d. Cir. 2009) (holding that where the parties are in direct competition the fourth *Polaroid* factor is irrelevant to the analysis). The irrelevance of this factor, however, further amplifies how strongly the competitive proximity factor weighs in favor of a finding of likelihood of confusion.

As to the fifth *Polaroid* factor, that is, whether there is evidence of actual confusion of consumers as to the origin or source of Sunflower's products, there is a high likelihood that evidence of actual confusion can be proved at trial. In the last ten years, there has been a large increase in online wholesalers and retailers of cake decorating and confectionery products.

(Czerczak Aff. ¶ 19.) CAI, a wholesaler of such products, has limited control over sales of DISCO DUST®-brand decorative glitter on the secondary market. (*Id.* ¶ 20.)  Given that there are many small retailers selling confectionery products, it is difficult for consumers looking for a specific manufacturer's or wholesaler's products to discern the original source simply from the retailer's often sparse online advertising; the consumer must therefore heavily rely on the trademark as the only indicator of source. (*Id.* ¶¶ 20-21). In addition, it is likely that Sunflower, which sells virtually identical goods, has sold products marked "Disco Dust" to the same customers as CAI. (*Id.* ¶ 27.) Thus, to the extent that evidence of actual confusion can be established at trial, this factor would weigh strongly in favor of likelihood of confusion.

Even if evidence of actual confusion cannot be established in any significant volume, the failure to prove actual confusion has little, if any, bearing on the likelihood of confusion between the marks in this case. As the Ninth Circuit has held, failure to prove instances of actual confusion is not dispositive against a finding of likelihood of confusion "because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy." *Brookfield Comms, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1050 (9th Cir. 1999); *accord*, *Lois Sportswear, USA, Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d. Cir. 1986) (stating that it is "black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source"). This is especially true in this case, given the identical nature of both the marks and the proximity of the goods. This factor is, at worst, neutral.

As noted above, there are strong indications that Sunflower adopted its "Disco Dust" mark for use in connection with decorative confectionery glitter in order to trade on the

consumer goodwill and market reputation of the DISCO DUST® mark. (Czerczak Aff. ¶ 27-29.) This attempt to trade on the goodwill inherent in the DISCO DUST® mark makes the sixth *Polaroid* factor—bad faith of the Defendant—weigh in favor of a finding of likelihood of confusion.

With respect to the seventh *Polaroid* factor, the quality of the Defendant's product, CAI has no evidence indicating the relative quality of Sunflower's "Disco Dust" products compared to CAI's DISCO DUST®-brand decorative glitter.  The only evidence available is that the underlying components of the products do not originate from the same source. Therefore, since the products could be of similar quality, this factor is neutral. *See Gruner + Jahr*, 991 F.2d at 1079 (noting that quality is weighed as a factor when there is an allegation that a low quality product is attempting to trade on the reputation of a high quality product and holding that if there is no evidence of that in a particular case, the factor is neutral).

Finally, the "sophistication of purchasers" factor is, at least, neutral and very likely weighs in favor of a finding of likelihood of confusion. This factor primarily concerns the care a consumer can reasonably be expected to exercise when making his or her purchasing decisions in the relevant market. Such degree of care has generally been held to depend on the cost of the product: "[t]he greater the value of an article the more careful the typical consumer can be expected to be; the average purchaser of an automobile will no doubt devote more attention to examining different products and determining their manufacturer or source than will the average purchaser of a ball of twine." *McGregor-Doniger, Inc. v. Drizzle, Inc.* 599 F.2d 1126, 1137 (2d. Cir. 1979).  In this case, the "sophistication of buyers" factor weighs in Plaintiff's favor, or is at least neutral, because the online retail prices of the goods at issue are not high, varying between $4 and $10 per jar.

14

Even if there were a higher degree of consumer care and sophistication expected of the ordinary purchaser, the fact that here the marks and the goods are both identical would nullify the impact of consumer sophistication on the *Polaroid* analysis. *Id.* (noting that in some cases, "where the products and marks are identical, the sophistication of buyers cannot be relied on to prevent confusion.").

In sum, as each of the *Polaroid* factors weighs either in favor of a finding of likelihood of confusion between CAI's use of the DISCO DUST® mark and Sunflower's use of its identical mark or is neutral/irrelevant, and as the most critical factors, i.e., those concerning the similarity of the marks and the competitive proximity of products, weigh decisively in CAI's favor, the second prong of the trademark infringement test is satisfied.

As CAI's DISCO DUST® mark is presumed valid and protectable through its Certificate of Registration and the *Polaroid* factors weigh heavily in favor of a likelihood of confusion finding, both prongs of the trademark infringement test are satisfied; thus, probable cause exists to sustain the validity of Plaintiff's trademark infringement claim for the DISCO DUST® mark.

B. PROBABLE CAUSE EXISTS TO SUSTAIN PLAINTIFF'S FEDERAL AND STATE UNFAIR COMPETITION CLAIMS AS TO ITS DISCO DUST® MARK.

CAI's claim under Section 43(a) of the Lanham Act and its parallel state common law unfair competition claims are also valid since the analysis of CAI's unfair competition claims is fundamentally the same as in the trademark infringement context. *Lois Sportswear*, 799 F.2d at 871 ("in either a claim of trademark infringement under § 32 or a claim of unfair competition under § 43, a prima facie case is made out by showing the use of one's trademark by another in a way that is likely to confuse consumers as to the source of the product").

Using the *Polaroid* test, CAI can establish probable cause for its claim for unfair competition under Section 43(a) of the Lanham Act. *See* discussion *supra* Part IV(A)(ii).

Similarly, a *prima facie* case of unfair competition is made out under Connecticut common law through a parallel analysis of the likelihood of consumers being confused or deceived by the entry of Sunflower's "Disco Dust"-marked goods into the marketplace. *Mohegan Tribe of Indians of Connecticut v. Mohegan Tribe & Nation, Inc.*, 255 Conn. 358, 376 (2001) (observing that the question to be determined is whether a trade name is used "such as to cause confusion in the public mind" and whether the "public is likely to be deceived").

As discussed in detail in Part IV(A)(ii) *supra*, the likelihood of confusion or deception of consumers is strong, given that the marks involved are identical to one another, the goods in connection with which each mark is used are virtually identical, and, as direct competitors in the marketplace, Sunflower and CAI are in close competitive proximity with one another. Under such circumstances, the consuming public, even acting with reasonable care, is likely to be confused by Sunflower's "Disco Dust" products in the market.  Finally, it is likely that such consumer confusion has resulted in and will result in further pecuniary damage to CAI. (Czerczak Aff. ¶¶ 26-29); *id.* (noting that the factfinder must determine that consumers would be confused using reasonable care under the circumstances and that any likely confusion cause pecuniary damage or "otherwise" to Plaintiff). Therefore, on similar grounds as its trademark infringement claim, CAI's federal and state common law unfair competition claims can be established at trial.

C.  PROBABLE CAUSE EXISTS TO SUSTAIN PLAINTIFF'S CUTPA CLAIM AS TO THE INFRINGEMENT OF THE DISCO DUST® MARK.

A violation of the Lanham Act is a *per se* violation of CUTPA. *Pfizer, Inc. v. Miles*, 868 F. Supp. 437, 442 (D. Conn. 1994); *Anthem Sports, LLC v. Under the Weather, LLC.*, No. 3:17-cv-596 (MPS) (D. Conn. Mar. 6, 2018) (observing that a "plaintiff's trademark infringement claim sets out a viable CUTPA claim inasmuch as it states a viable claim under the Lanham

16

Act"). Therefore, probable cause exists to sustain CAI's CUTPA claim because, as discussed in Parts IV(A) and (B) *supra*, probable cause has been established for CAI's federal trademark infringement and federal unfair competition claims under the Lanham Act.

> D.  PROBABLE CAUSE EXISTS TO SUSTAIN THE VALIDITY OF PLAINTIFF'S CLAIMS AS TO ITS CONFECTIONERY ARTS INTERNATIONAL® MARK.

> (i)  There is probable cause to sustain the validity of CAI's claim for infringement of the <u>CAI house mark.</u>

Following the analysis of Sunflower's infringement of CAI's DISCO DUST® mark in Part IV(A) *supra,* Plaintiff's claim concerning its house mark meets both prongs of the trademark infringement test, that the mark is entitled to protection and that there exists likelihood of confusion. *See Guthrie Healthcare System,* 826 F.3d at 37. The first prong is satisfied because the CAI house mark is presumed to be protectable via its Certificate of Registration, *see Lane Capital Mgmt.*, 192 F.3d at 345, which was granted on December 25, 2012 (Czerczak Aff. ¶¶ 15-17). The second prong is satisfied because the relevant *Polaroid* factors weigh heavily in favor of a finding of likelihood of confusion between CAI's house mark and Sunflower's "shell" corporation in the name of "Confection*a*ry (spelled with an "a") Arts International, LLC." (Czerczak Aff. ¶¶ 33-35.)

The analysis of CAI's trademark infringement claim with respect to the CAI house mark differs slightly from that of the DISCO DUST® mark, because Sunflower's "shell" corporation name is not absolutely identical (difference of one letter), the history of the adoption of the junior mark differs, and the products sold (or which are potentially sellable) under the marks cover an overlapping, but not identical inventory. Even though an analysis of all eight *Polaroid* factors can be made, the third (competitive proximity), fourth (bridging the gap), seventh (quality of goods) and eighth (sophistication of consumers) factors are closely connected to products and fall in line with the DISCO DUST® analysis *supra*. The remaining *Polaroid* factors are: (1) the

strength of the trademark; (2) the similarity of the marks; (5) evidence of actual confusion; and

(6) evidence that the imitative mark was adopted in bad faith. *Star Industries,* 412 F.3d at 384.

 With respect to the first factor, the strength of the mark, CAI's house mark is at least

suggestive, as it is not descriptive of the goods sold or offered for sale under it. The term

"confectionery," the dominant word in the mark, implies a connection to the industry of

confections and sweets, and the addition of the terms "arts" and "international" call to mind the

creative process and the global reach of CAI's business, respectively. The addition of the stylized

element in the CAI house mark adds considerable distinctiveness. Whether classified as

"arbitrary" or "suggestive", the CAI house mark is strong from the standpoint of inherent

distinctiveness, its strength further enhanced by CAI's use of it for over twenty years, during

which time the CAI house mark has had substantial sales traffic in the Class 30 goods for which

it is protected. There is no contesting that "CONFECTIONERY ARTS INTERNATIONAL" is

CAI's exclusive trade name under which it has been selling products since its inception in 1997.

The strength of mark factor, therefore, weighs heavily in favor of a finding of likelihood of

confusion.

 As to the second factor, similarity of the marks, the points of comparison are appearance,

sound, meaning, and commercial impression. *See Palm Bay Imps., Inc. v. Veuve Clicquot

Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1371 (Fed. Cir. 2005) (citing *In re E. I. du

Pont de Nemours & Co.*, 476 F.2d 1357, 1361 (C.C.P.A. 1973)). The CAI house mark and the

Sunflower "shell" company name are essentially identical in their sound, meaning, and overall

commercial impression. Even taking into account the stylized mark, there is only one letter, and

a fictitious corporate designation, that separates the two marks. Indeed, Sunflower's intended

purpose in incorporating this new company was to create confusion or mistake based on an oft-

made typographical error for the word "confectionery." Therefore, this factor strongly favors a finding of likelihood of confusion.

Even though there is currently no evidence of actual consumer confusion, the fifth *Polaroid* factor, there is actual evidence of confusion by an administrative agency, the Connecticut DEEP.  (Czerczak Aff.  ¶¶ 35-36.)  As such, this factor is at least neutral, or slightly favors a finding of likelihood of confusion.

Finally, the bad faith *Polaroid* factor is exceedingly relevant here, given that the ostensible purpose of the creation of the "shell" company by Sunflower was to deceive the USPTO as to the identity of the owner of the DISCO DUST® mark. (Czerczak Aff. ¶¶ 31, 33.) The bad faith factor thus strongly favors a finding of likelihood of confusion.

Therefore, all of the relevant *Polaroid* factors above weigh strongly in favor of a finding of likelihood of confusion with respect to Sunflower's use of the trade name "Confectionary (spelled with an "a") Arts International, LLC." The remaining factors are either irrelevant if "Confectionary Arts International, LLC" has not produced or sold any goods or services under the trade name, or follow the analysis of Part IV(A)(ii) *supra*, if it sells products in the same industry, of the same quality and to the same consumers as its affiliate Sunflower. As such, CAI has probable cause to sustain the validity of its claim for infringement of the CAI house mark.

(ii)   Plaintiff's CUTPA claim as it pertains to Sunflower's incorporation of "Confectionary Arts International, LLC" (spelled with an *a*) is valid.

Sunflower's incorporation of the Connecticut company Confectionary Arts International, LLC (spelled with an "a") for the purpose of misleading the TTAB, and by extension the USPTO, constitutes a quintessentially unfair and deceptive trade practice. CUTPA prohibits persons from engaging in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a); *Sportsmen's*

*Boating Corp. v. Hensley*, 192 Conn. 747, 755 (1984). In determining whether a trade practice violates CUTPA, Connecticut courts apply the criteria set forth by the Federal Trade Commission in the "Cigarette rule" for determining unfairness. *Harris v. Bradley Memorial Hosp. & Health Ctr.*, 994 A.2d 153, 173 (Conn. 2010).

The Cigarette Rule criteria are: (1) whether the practice, without necessarily having been considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, is it within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether the practice is immoral, unethical, oppressive, or unscrupulous; (3) whether the practice causes substantial injury to consumers, competitors or other businesspersons. *Artie's Auto Body v. Hartford Fire Ins. Co.*, 119 A.3d 1139, 1143 (Conn. 2015). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three…." *Harris*, 994 A.2d at 173.

With respect to the first criterion, the timing of the incorporation (two days after filing a Petition to Cancel) and the choice to spell the word "Confectionary" with an "a," combined with the theory of ownership propounded by Sunflower before the TTAB, establish that the primary motive for Sunflower's incorporation of the "Confectionary Arts International, LLC" (spelled with an "a") was not to engage in business activities, but to deceive the USPTO as to the actual ownership of the DISCO DUST® mark. As such, establishing a business entity for the purpose of deceiving a federal government agency falls squarely within common law concepts of unfairness and, moreover, would certainly violate both state and federal public policy. The first criterion is satisfied to a high degree, given that attempted deception of a government agency is the basis for this CUTPA claim.

20

For the same reasons, the attempted deception of a government agency is unethical, immoral and unscrupulous, and thus meets the second Cigarette Rule criterion. This is especially the case when Sunflower knew or had reason to know of CAI's claim to ownership of both the DISCO DUST® mark and its house mark. That is, by incorporating the shell entity, Sunflower attempted to convince the USPTO that a third party, that was neither CAI nor Sunflower, was the owner of the mark. Such conduct surely constitutes immoral and unscrupulous behavior.

Finally, the third criterion examines whether the consumer or business injury created by the unfair practice is substantial, whether that substantiality is outweighed by any countervailing consumer or competition-related benefits to the trade practice, and whether the unfairness of the practice could have been avoided by the plaintiff. *Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559, 592 (1995); *McLaughlin Ford, Inc. v. Ford Motor Co.*, 192 Conn. 558, 570 (1984) (applying third factor equally to competitors as to consumers).

Sunflower's incorporation of this shell company caused substantial injury to CAI in the form of time, labor, and expense in setting the record straight and making clear to all parties that no company called "Confectionary Arts International, LLC" (with an "a") ever legitimately existed. This injury incurred by CAI is not outweighed by any countervailing competitive or consumer benefits from Sunflower's actions, because there are simply no competitive or consumer benefits to a practice designed to deceive governmental agencies. Lastly, CAI could not have reasonably foreseen or avoided that Sunflower would engage in such conduct. As such, Sunflower's conduct satisfies the third Cigarette Rule criterion for unfairness as well. Probable cause exists, therefore, to sustain the validity of CAI's CUTPA claim against Sunflower's incorporation of the "Confectionary Arts International, LLC" shell company.

E.  PROBABLE CAUSE EXISTS TO SUSTAIN THE VALIDITY OF PLAINTIFF'S TORTIOUS INTEFERENCE AND TRADE LIBEL CLAIMS.

21

(i)     Probable cause exists to sustain Plaintiff's tortious interference claim because Sunflower has made intentional false statements to at least one of CAI's existing <u>customers.</u>

The well-settled standard for proving a claim for tortious interference with business relationships or business expectancies requires that the plaintiff show: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss. *Greenwich Taxi, Inc. v. Uber Techs., Inc.*, 123 F. Supp. 3d. 327, 342 (D. Conn. 2015); *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 27 (2000). Further, for a tortious interference claim to be made out, a plaintiff must establish that the interference by the defendant was, in fact, "tortious." *Daley v. Aetna Life Ins & Cas. Co.*, 249 Conn. 766, 805-806, 734 A.2d 112 (1999). The wrongful conduct required for the interference to be tortious may be satisfied by evidence that, for example, the defendant committed fraud, misrepresentation, or that the defendant acted maliciously (i.e., intentional interference without justification) or for some other improper motive. *Id.*

Sunflower sent an online communication to a customer of CAI encouraging the customer not to continue purchasing CAI's DISCO DUST®-brand decorative glitter on the false grounds that CAI was "passing off" an "imitation" form of DISCO DUST®-brand decorative glitter and that CAI's decorative glitter was produced in China. (Am. Compl. ¶ 88; Czerczak Aff. ¶ 40.) Both false statements made by Sunflower—that CAI's DISCO DUST® products were not the authentic DISCO DUST® brand and that CAI's products were made in China—were made with an intent to divert the customer to Sunflower's "Disco Dust"-marked decorative glitter and to call into question the product integrity and consumer reputation of CAI's DISCO DUST® products. (Czerczak Aff. ¶ 42.)

22

It has been established that there was a business relationship between CAI and its customer. While it was unclear to the customer in question how Sunflower discovered the existence of this relationship, Sunflower's statement implies that not only was the third party already a customer of CAI, but that Sunflower was aware of this relationship and sought to direct the customer's business to itself. (*Id.* ¶¶ 39-42.) It is highly unlikely that this is the only such attack by Sunflower on the reputation of CAI's products, simply the only one that was revealed to CAI. Any customer who believed Sunflower's claims, or simply did not want to involve itself in this apparently contentious situation, would have had no reason to contact CAI to inform it of the false communication. In addition, after the filing of this action, Sunflower sent an email to CAI threatening to destroy CAI's business reputation. (Czerczak Aff. ¶ 38.) Further, using fake names and pseudonyms to disguise their identity, Sunflower employees or personnel made additional false statements about CAI and its products through product reviews, including one posted on or about January 30, 2017 that stated, falsely, that there was an "FDA advisory" on "plastic glitter." (Czerczak Aff. ¶ 39.)

Thus, this is not a simple instance of a competitor seeking to advertise its products and extoll its products or services as better than CAI's. The "reasons" provided by Sunflower for the customer to divert its business to it are, in fact, false claims as to geographic origin, and thus quality, of CAI's DISCO DUST® products. Because this interaction is an intentional attempt to interfere in a customer relationship through misrepresentation without justification, probable cause exists to sustain the validity of CAI's claim for tortious interference with business relationships.

    (ii)     Probable cause exists to sustain the validity of Plaintiff's trade libel claim because Sunflower has made intentional false statements to at least one of CAI's existing <u>customers and in online reviews of CAI's products.</u>

     "Defamation or disparagement of a business's goods or services may be considered trade

libel." *Qsp, Inc. v. Aetna Cas. & Sur. Co.*, 256 Conn. 343, 358 (2001). To prove commercial

disparagement or trade libel, a plaintiff must demonstrate that the defendant made false

representations and that the defamatory statements concerned the plaintiff. *CSL Silicones, Inc. v.*

*Midsun Grp., Inc.*, 301 F. Supp. 3d 328, 370 (D. Conn. 2018).

As discussed in Part IV(E)(i) *supra*, all the statements made by Sunflower to CAI's

customers and in reviews of CAI's products on online retail websites, including that CAI's

DISCO DUST® products are "imitation," that its products are made in China, and that there

were FDA advisory issues on the plastic glitter, are false. (Czerczak Aff. ¶¶ 39-42.)  These false

statements concerned both CAI and its goods and, given Sunflower's threats to destroy CAI's

reputation, were certainly known to be false by Sunflower. Further, the false statements made by

Sunflower were intended to result in, and in fact resulted in, a materially negative impact on the

commercial reputation and consumer goodwill of CAI's DISCO DUST® products. As such, CAI

can establish probable cause on the validity of its claim for business disparagement or trade libel.

## V.    PLAINTIFF'S APPROXIMATE MONETARY RECOVERY ASSESSMENT SUPPORTS AN ATTACHMENT OF $ 510,000.

CAI has reasonably assessed that it would be entitled to recovery of $510,00 in

compensatory damages, punitive damages for unfair competition and violations of CUTPA, and

attorneys' fees for intentional and/or willful conduct.  CAI's estimate is approximately treble

Sunflower's own disclosed profits on the Infringing Products over the period from registration to

this day.  Plaintiff seeks to attach $510,000 in consideration of the fact that, according to

Sunflower's production during discovery, the estimated amount of Sunflower's profits from the

infringement of CAI's DISCO DUST® mark is $180,000 total for the last five (5) years and that

such amount is likely to be trebled due to Sunflower's willful tortious conduct.

As CAI has shown via the evidence presented that it is entitled to a prejudgment remedy

of attachment in an amount equal to or greater than the amount sought above, CAI respectfully requests that the Court grant the prejudgment remedy and attach Sunflower's assets in the amount stated above.

### VI.   PLAINTIFF IS ENTITLED TO AN ORDER COMPELLING DEFENDANT TO DISCLOSE AND TURN OVER ITS ASSETS, TO SUSTAIN THE PREJUDGMENT REMEDY.

Plaintiff also moves the Court, pursuant to Conn. Gen. Stat. § 52-278n, for an Order compelling Sunflower to disclose and turn over its assets to sustain the viability of the prejudgment remedy sought. Given that Sunflower is a Florida corporation with its registered address in Florida, is unlikely that all (or any) of Sunflower's assets are in the State of Connecticut. Therefore, in order to effectuate the prejudgment remedy, Sunflower should be ordered to bring any assets into the State of Connecticut for attachment in the State.

The Court has the authority to issue such an order, even prior to a hearing on probable cause for the prejudgment remedy. *See, e.g., Metal Management, Inc. v. Schiavone*, 514 F. Supp. 2d 227, 239 (D. Conn. 2007) (holding that the court possesses the authority to order disclosure of assets); *Lyons Hollis Assoc., Inc. v. New Technology Partners, Inc.*, 278 F. Supp. 2d 236, 246 (holding that if the court has personal jurisdiction over the defendant and if justice warrants disclosure, it is within the court's power to order the delivery of assets into Connecticut for purposes of attachment). In this case, the Court clearly has personal jurisdiction over Sunflower, given the intentionally tortious conduct exhibited by it against CAI. *Calder v. Jones*, 465 U.S. 783, 788-791 (1984) (holding alleged libelous conduct outside the forum sufficient for personal jurisdiction even without other minimum contacts); *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008) (holding that personal jurisdiction for trademark infringement is satisfied under *Calder* because of effects inside the forum). In any case, any challenge to such jurisdiction

has been waived by Sunflower due to its dilatory conduct in responding to CAI's original and amended complaints. Thus, to prevent an unwarranted and unfair dissipation of Sunflower's out-of-state assets prior to judgment, justice requires that Sunflower be ordered to deliver up sufficient assets to be able to be attached in the amount sought by CAI's application for prejudgment remedy.

**VII.    CONCLUSION**

In light of the foregoing, Plaintiff respectfully requests that the Court grant its application and motion for a prejudgment remedy of attachment of Defendant's assets in the amount of $510,000 (Czerczak Aff. ¶¶ 45-46), and order Defendant to disclose all assets, regardless of where those assets are located, and deliver up sufficient assets into the State of Connecticut and the Court's jurisdiction to satisfy the prejudgment remedy amount, and any such further relief that the Court believes is just and proper.

Respectfully Submitted,

Confectionery Arts International, LLC

By:    __/s/ Daniel R. Cooper_____
Daniel R. Cooper, Bar No. ct30240
Cooper & Kurz
170 Eden Road
Stamford, CT 06907
Tel. 203-322-4852
Fax. 203-329-7881
kurzcooper@att.net

Nike V. Agman, Bar No. ct28172
Law Office of Nike V. Agman
360 Bloomfield Avenue, Suite 301
Windsor, CT 06095
Tel. 860-607-3237
Fax. 860-607-3201
nike.agman@comcast.net

*Attorneys for Plaintiff*

26

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 16, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing. Parties may access this filing through the Court's system.

     /s/ Daniel R. Cooper   
Daniel R. Cooper